Receipt #062774

ORIGINAL

FILED
APR 22 2005
U.S. COURT OF FEDERAL CLAIMS

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Government Telecommunications, Inc.
4500 Southgate Place, Suite 300
Chantilly, Virginia 20151,

Plaintiff,

v.

The United States,

Defendant.

No. 05- 491C

**COMPLAINT**

COMES NOW the Plaintiff, Government Telecommunications, Inc. (GTI), by counsel, and hereby asserts the following for its Complaint against the Defendant, the United States, acting through and by the United States Postal Service (USPS or Postal Service), and states as follows:

**JURISDICTION**

1. This court has jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491. GTI brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq*. (CDA).

2. Pursuant to the CDA, 41 U.S.C. § 609, GTI brings this action directly to the United States Court of Federal Claims within 12 months of the imputed "deemed denied" date of the Contracting Officer's Final Decision.

**PARTIES**

3. The Plaintiff, GTI, is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Chantilly, Virginia. Among

other things, GTI contracts with various United States governmental agencies, including the Postal Service, for the design and installation of electrical and telecommunication equipment infrastructure. One of GTI's specialties is the performance of such installation on multiple, geographically diverse, locations. GTI is a wholly owned subsidiary of Computer Equity Corporation. Computer Equity Corporation is a wholly owned subsidiary of Applied Digital Solutions, Inc., headquartered in Delray Beach, Florida.

4. The Defendant is the United States, acting through its agency, instrumentality, and/or agent, the Postal Service.

## NATURE AND SUMMARY OF ACTION

5. This action is brought by GTI pursuant to the provisions of the CDA, 41 U.S.C. § 609 seeking recovery against the government for the additional costs incurred by GTI as a result of technical changes made by the Postal Service to the conduit requirements under Contract 3AAERD-03-P-6080 (the Contract). More particularly, GTI is entitled to its additional costs in complying with USPS's various directions that changed the design from liquidtight flexible metal conduit (liquidtight) supported by a wire rope mechanism (supported liquidtight) to electrical non-metallic tubing (ENT), then to Mohawk cable, and finally back to supported liquidtight. Because of these changes, all of which were directed by the Postal Service, GTI seeks recovery of $82, 364, plus interest as allowed under the CDA. This action is related to Civil Action No. 05-463C filed on behalf of the same plaintiff on April 11, 2005.

## STATEMENT OF FACTS

### *Contract Award and Overview*

6. On April 7, 2003 the USPS issued RFP 3AAERD-03-A-1200, accompanied by a statement of work (SOW) defining the requirements for upgrading the existing baseband local

area network wiring at up to 62 mail processing plants (sites) and 12 co-located administrative networks to meet current wiring standards for "USPS structured wiring." These initial 62 sites came to be known as the "Phase I" sites. The additional 88 sites added via Amendment 2 to the solicitation on April 24, 2003 came to be known as the "Phase II" sites. The procurement was conducted under USPS competitive procedures, terms, and conditions. Eight contractors were solicited.

7. According to the SOW, the scope of work for this program, termed the Mail Processing Infrastructure or MPI program by USPS, included pre-installation, installation, and post-installation activities necessary for successful structured wiring implementation.

8. Proposals were initially submitted on May 5, 2003. On May 15, 2003, the Postal Service held a vendor conference, the purpose of which was to ensure a common understanding of the work inherent in each Contract Line Item Number (CLIN) by providing a detailed oral description of the CLIN requirements. The offerors then submitted revised pricing on May 20, 2003.

9. On June 4, 2003, GTI was notified by the Postal Service that it was one of the finalists for award. USPS invited GTI to a meeting on June 6, 2003 for further negotiations on GTI's offer; and later on June 6th, GTI submitted its final price proposal. On June 20, 2003, the Postal Service notified all bidders that Contract award had been made to GTI.

10. GTI experienced a number of occasions during the course of performance where it incurred additional costs due solely to the actions, inactions, or decisions of the Postal Service and for which GTI, pursuant to the terms of the Contract or otherwise, is entitled to an upward adjustment in Contract price. One of these categories for which GTI is entitled to recover is the

additional cost for complying with USPS's directives concerning technical changes to the conduit.

*Factual Background – Liquidtight Conduit*

11. GTI was obligated by the MPI Contract to use liquidtight flexible metal conduit. Section B.5 of the Contract SOW called for "each head end side of the one inch EMT (liquidtight or non-metallic equivalent) shall have a downturn fitting to provide stress relief on the encased UTP patch cable."

12. Consistent with Section B.5's requirement for "liquidtight or equivalent," the Postal Service asked offerors to price the use of liquidtight metal tubing, connectors, and couplings as part of the Revised Line Item Schedule. In Section 2.24 of its Technical Proposal, GTI acknowledged the requirement of the Postal Service to use liquidtight conduit.

13. As contemplated by the MPI Contract, GTI submitted its proposal for each of the Phase I sites to the Postal Service and specifically proposed the use of liquidtight conduit. Those proposals mirrored the Wire and Cable Services (WACS) design, especially as it pertained to the use of liquidtight at the zone boxes. USPS and its Raleigh Engineering Group (Northrup Grumman consultants contracted to act on behalf of the Postal Service) approved each proposal before installation.

14. In mid-May 2004, USPS decided to commence using Flex Plus corrugated plastic (*i.e.*, electrical non-metallic tubing or ENT) in place of liquidtight for its Phase II sites, apparently in the belief that, unlike liquidtight, the ENT would not require a support mechanism in order to meet safety requirements. USPS sent GTI product literature about ENT and, on May 24, 2004, directed GTI to prepare proposals for Phase II sites using ENT in lieu of liquidtight.

15. Based on this direction to use ENT, GTI's engineers changed GTI's "build out tool" to address the different assumptions in the design and redesign of each of the affected sites to incorporate ENT in place of liquidtight. This "build out tool" was an Excel® spreadsheet used to calculate the quantities of materials required for each site. This tool contains many interrelated formulas that can be significantly affected by changes to the design. GTI's engineers spent a significant amount of time altering the "build out tool" to address the Postal Service's change.

16. At a meeting in late May 2004, USPS notified GTI that it had reconsidered its decision to use ENT. At that point, USPS directed GTI to continue installing supported liquidtight at Phase II sites 1 – 15, and advised that USPS was considering changing to a new composite cable that would be manufactured by Mohawk/CDT (Mohawk cable) in lieu of supported liquidtight for future sites.

17. This decision was reflected in a June 1, 2004 letter from the Postal Service to GTI wherein USPS directed GTI to install the first 15 Phase II sites using "liquidtight . . . [and] liquidtight wire rope support ungrounded." USPS also directed GTI to procure material for only those first 15 sites and to "monitor material lead time and ensure that schedule commitments are kept." The June 1st letter also advised GTI that "the MPI Project will move towards implementing the Mohawk cabling solution."

18. USPS further advised GTI that the Mohawk cable implementation process would include several meetings and demonstrations on June 2nd and June 8th and that USPS would require GTI to submit a proposal after the June 8th demonstration. The Postal Service stated that it would make a final decision on the use of Mohawk cable at other Phase II sites after it received

GTI's proposal. USPS promised to give further direction by June 11th on the purchase of additional material and installation procedures.

19. At the June 3, 2004 Program Review Meeting, USPS and GTI discussed the Postal Service's plan to change its design to Mohawk cable. In particular, GTI was concerned about the safety and effectiveness of terminating Mohawk cable inside a zone box. Moreover, GTI was concerned that USPS was moving away from its commercial-off-the-shelf solution to a proprietary solution, in that Mohawk cable was a prototype, custom cable available only from one manufacturer. As a result of these concerns, USPS directed GTI to meet with USPS personnel at the Southern Maryland site to conduct a prototype installation of MPE Communications Boxes with Mohawk cable. An MPE Communications Box is a telecommunications outlet consisting of six Category 6 jacks. The box is used as the interface point between the MPE and the new telecommunications infrastructure. GTI was tasked with documenting the installation procedures as well as the material and labor requirements.

20. USPS promised to provide "final direction" on the use of Mohawk cable after review of the proposal. GTI warned USPS that a decision on the use of Mohawk cable was becoming critical to the schedule, because of the lead time (approximately six weeks) that GTI was being quoted on the Mohawk cable. GTI told USPS that USPS had to provide direction on the liquidtight vs. ENT vs. Mohawk issue no later than June 11th to avoid delays to the final site completion schedule for the next group of sites (nos. 16 – 31) whose installations would be starting in July 2004.

21. On June 8, 2004, GTI and two of its installation subcontractors accompanied USPS to the Southern Maryland Processing and Distribution Center (P&DC). GTI's subcontractors installed a mock-up of the Mohawk cable at the site, and GTI documented the

installation procedure as directed. On June 16, 2004, USPS directed GTI to adopt the Mohawk cable solution for the remaining 87 Phase II MPI sites under the MPI Contract (which would include all Phase II MPI Sites after site 15).

22. Pursuant to the June 16th direction, GTI engaged in engineering efforts, adjusted schedules, and conducted price negotiations with its subcontractors and suppliers. Among other efforts GTI undertook to address the Postal Service's direction, GTI's engineers again changed the GTI "build-out tool" for developing proposals that incorporated the use of Mohawk cable. GTI then began redesigning and pricing out the remaining Phase II pre-blackout sites (sites 16 – 44).

23. At the July 1, 2004 Program Review Meeting, USPS announced that a new SOW that addressed Mohawk cable would be issued in one to two weeks.

24. Based on the Postal Service's determination and direction that the project would go forward with Mohawk cable and its announcement that Mohawk cable would be added to the SOW, GTI took action to ensure that the Mohawk cable would be available so as to maintain the project schedule. On July 6, 2004, GTI directed its supplier, Anixter, to order 40,000 feet of Mohawk cable. On July 10, 2004, Anixter ordered the cable. On July 16th, GTI told Anixter to go forward with the purchase order because of the lead time issues and minimum purchase requirements quoted to Anixter by Mohawk/CDT.

25. On or about July 19, 2004, GTI provided USPS with prices for new CLINs for the Mohawk cable. On July 20, 2004, after reviewing the proposal, USPS directed GTI to provide more information on the pricing of the Mohawk cable. USPS directed GTI to "identify an alternate sourcing strategy or negotiate the unit price. . . ." In response, GTI advised the Postal Service about price and delivery issues with using Mohawk cable. Mohawk cable was "a new

product that is not commercially available until the USPS requested it be provided on the MPI Program." Accordingly, GTI included the costs of engineering, training, documentation, handling, inspection and other charges in its proposed price of the cable. It explained that its proposed price "covers the increased risk involved utilizing an unknown and unproven design and is our final price to the USPS."

26. On July 21, 2004, GTI's supplier, Anixter, advised GTI that, if it were to need to order liquidtight items, Anixter would need a four-week lead time, plus transit time from the warehouse to the site. Also on July 21, 2004, USPS and GTI met to discuss pricing of the Mohawk solution. The Postal Service was concerned the Mohawk solution might be too expensive and risky due to issues such as terminations, warranty, training, and handling, among other considerations.

27. At USPS's direction, on July 22, 2004, GTI provided updated pricing for the new CLINs including a comparison between the supported liquidtight approach and the Mohawk solution. On July 23, 2004, USPS and GTI met again to discuss the Mohawk pricing. At that meeting, USPS told GTI that it had decided not to use the Mohawk cable and directed GTI to return to the supported liquidtight solution. GTI immediately directed Anixter to cancel the Mohawk order, but, as GTI had warned, there were extra costs because of the delay in making a decision. Mohawk charged Anixter with a cancellation fee because the order had not been cancelled within 10 days of the original order placement. Anixter negotiated with Mohawk to reduce the cancellation fee to $6,000.

28. By letter dated July 27, 2004, USPS confirmed its earlier notice that it had decided not to go forward with the Mohawk cable solution, but had decided instead to revert to the supported liquidtight solution. That same day, GTI advised the Postal Service that that

reversal would create additional efforts and result in extra costs. At the least, the change would require GTI to incur additional efforts to redesign and prepare quotes for the sites covered by the Postal Service's earlier direction to use Mohawk cable.

29. GTI had to again redesign the remaining pre-blackout Phase II sites (sites 16 – 44) because it had already redesigned those sites to use the Mohawk cable solution at the Postal Service's direction. GTI was also faced with cost and schedule issues. In particular, the long lead time on liquidtight (5 to 6 weeks) made it difficult to make the change again without an impact to the schedule and inefficiencies for GTI and its subcontractors on Phase II.

30. Based on the Postal Service's June 1st letter, GTI was already installing liquidtight at Phase II Sites 1 – 15. But, the Postal Service's late decision to return to supported liquidtight on Phase II sites (16 – 31) posed considerable difficulties because of the long lead time to procure the liquidtight product. In order to minimize the impact, GTI proposed using the Postal Service's previously directed material, ENT, on Phase II sites 16 – 31 because ENT had a shorter lead time. GTI had ordered ENT at the Postal Service's direction on May 24, and it had 12,000 feet available at Anixter's warehouse that could be ready for installation in two weeks.

31. On August 9, 2004, GTI proposed to provide the ENT at the same cost as the liquidtight. On August 12, 2004, the USPS Contracting Officer directed GTI to use ENT rather than liquidtight on Sites 16 – 31 but to use liquidtight if possible. Sites 32 and up were to receive the supported liquidtight solution. GTI proceeded as directed by the Postal Service.

32. The foregoing changes directed by USPS in the technical requirements related to liquidtight and the support thereof created significant costs and schedule impacts. The Postal Service diverted GTI from the supported liquidtight solution and directed it to implement two new solutions. USPS's changes in the specifications, from supported liquidtight, to ENT, then to

Mohawk cable, and ultimately back to supported liquidtight required GTI to expend efforts on multiple redesigns of its "build-out tool" for designing and pricing sites, to redesign sites, and to reprice the installations at Phase II sites. In some instances, GTI was forced to redesign sites several times to deal with the Postal Service's direction first to use supported liquidtight, then ENT, then Mohawk cable, and finally back to supported liquidtight.

33. On December 14, 2004, GTI submitted to the Postal Service a Request for Equitable Adjustment (REA) seeking an amount of $82,364 associated with the additional costs arising from USPS's multiple technical changes regarding the Contract's conduit requirements. Despite GTI's multiple invitations to meet and discuss the liquidtight conduit REA, USPS failed and refused either to meet or discuss the matter.

34. Having reached a constructive impasse in the liquidtight REA contract administration process, GTI on February 14, 2005 re-filed the REA as a claim under the CDA and formally requested a Contracting Officer's final decision thereon. Since that filing, more than 60 days has elapsed without the Contracting Officer's issuance of a final decision or a Contracting Officer's request for more time within which to issue a final decision. As such, GTI's certified claim on the liquidtight issues is deemed denied. *See Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298 (Fed. Cir. 1996).

## COUNT I

### Equitable Adjustment: Failure to Issue an Equitable Adjustment for Additional Costs Arising from the Multiple Changes to the Conduit Requirements under the "Changes" Clause

35. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 34 as if fully set forth herein.

36. The Contract includes a "Changes" clause under which GTI is entitled to an equitable adjustment to the Contract price for directed or constructive changes to the Contract. *See* Contract clause 3.6.c., "Changes." Contract clause 3.6.c.(3) provides that "[i]f any such change affects the cost of performance or the delivery schedule, the contract will be modified to effect an equitable adjustment."

37. USPS's multiple changes to the conduit requirements as described above constructively changed the Contract and caused GTI to incur costs that it otherwise would not have incurred. These additional costs, in turn, were exacerbated by the Postal Service's repeated failures to give GTI adequate, timely, and consistent direction as to these changes.

38. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the additional costs associated with its multiple changes to the conduit requirements. As a direct and proximate result of USPS' wrongful failure to issue an equitable adjustment, GTI has sustained damages in the amount of $82,364.

39. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests that the Court enter judgment against the Postal Service on Count I in the amount of $82,364, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

## COUNT II

**Breach of Contract: Failure to Issue an Equitable Adjustment and Modify the Contract Under the Changes Clause for Additional Costs Arising from Multiple Changes to the Conduit Requirements**

40. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 39 as if fully set forth herein.

41. Pursuant to the Contract and applicable law, the Postal Service had an obligation to issue to GTI an equitable adjustment and modify the Contract under the "Changes" clause for the additional costs arising from the multiple changes to the conduit requirements as exacerbated by the Postal Service's repeated failures to give GTI adequate, timely, and consistent direction as to these changes.

42. The Postal Service materially breached the Contract by failing to issue an equitable adjustment for these additional costs.

43. As a direct and proximate result of USPS's breach of Contract, GTI has sustained damages in the amount of $82,364.

44. GTI has exhausted its contractual and administrative remedies, has properly invoked the CDA dispute-resolution process, and is properly before the Court for decision on this claim.

WHEREFORE, GTI respectfully requests, in the alternative to the relief requested in Count I, that the Court enter judgment against the Postal Service on Count II in the amount of $82,364, plus pre-judgment and post-judgment interest, attorneys' fees, costs, and such other relief as this Court deems appropriate.

Dated: this 22nd day of April 2005.

Respectfully submitted,

**Government Telecommunications, Inc.**

By Counsel:

John C. Person, Esquire
PERSON & CRAVER LLP
1801 K Street, N.W.
Washington, D.C. 20006
(202) 466-4434 – phone
(202) 466-4416 – fax
jcperson@perscrav.com

Attorneys for Plaintiff

Of Counsel:

Michael Krawitz, Esq.
General Counsel, Applied Digital